UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXOTO, INC., <br><br> Plaintiff, <br><br> v. <br><br> SUNRICH COMPANY, LLC, et al. <br><br> Defendants. | Case No.: 2:21-cv-03754-MEMF-SSC <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL** |

Plaintiff Exoto, Inc. ("Exoto") and Defendants Sunrich Company, LLC ("Sunrich"), Glen Chou, and Cindy Chou (collectively, "Defendants") appeared for a bench trial before this Court on December 11, 2023, which concluded on December 13, 2023.[1] On December 29, 2023, the parties filed their closing briefs. ECF Nos. 172 ("Pl. Brief"), 173 ("Def. Brief"). Pursuant to Fed. R. Civ. P. 52, the Court renders its Findings of Fact and Conclusions of Law.

## I. BACKGROUND

Exoto and Sunrich are both companies that sell race car scale models. This dispute arises from Exoto's allegations that Sunrich, and its co-owners, Glen and Cindy Chou, misappropriated the tooling used to produce Exoto's race car scale models and thereby counterfeited Exoto's race car scale models. At the conclusion of Exoto's case in chief, the Court granted Defendants' motion for judgment as a matter of law in part, leaving Exoto's First Cause of Action for Conversion and Second Cause of Action for Unjust Enrichment as the remaining claims at issue. *See* ECF No. 165. Exoto requests damages in the form of costs and expenses of manufacturing and engineering the alleged misappropriated tooling, as well as lost profits. Defendants deny that Exoto had any ownership rights to the tooling and that they unlawfully obtained, converted, or had access to Exoto's tooling, and deny that Exoto has proven any damages with reasonable certainty.

Any finding of fact deemed to be a conclusion of law is hereby incorporated into the Conclusions of Law. Any conclusion of law deemed to be a finding of fact is hereby incorporated into the Findings of Fact.[2]

///

///

---

[1] As the trial transcripts have consecutive page numbering, the Court will cite to the testimony therein with the name of the testifying party and applicable page number and lines, rather than to the specific ECF number. For clarity, the Day 1 Transcript (ECF No. 174) runs from pages 1 to 213, the Day 2 Transcript (ECF No. 175) runs from pages 214 to 456, and the Day 3 Transcript (ECF No. 176) runs from pages 457 to 602.

[2] The Court does not find that its factual findings require an assessment of credibility on any witness, and accordingly does not find it necessary to reach the issue of Mr. Keusseyan's credibility based on the admission of Exhibits 224-229.

## II. **FINDINGS OF FACT**

### A. The Court reiterates its findings of fact following summary judgment.[3]

1. There are two primary methods of manufacturing scale models: die-casting and resin casting. *See* ECF No. 81 ("MSJ Order").

2. Die-casting is a method of producing a model by forcing molten metal under high pressure into a mold cavity. *Id.*

3. The mold cavity is created using two hardened tool steel dies (called tooling), which have been machined into a particular shape. *Id.*

4. Such models are made of metal, with plastic, rubber, glass, or other machined metal component parts, which are assembled after tooling to make the model. *Id.*

5. Resin casting, on the other hand, is a method of producing a model by filling a soft mold with a liquid synthetic resin, which then hardens. *Id.*

6. Exoto manufactures and sells die-cast, 1:18 scale race car models. *Id.*

7. Sunrich is in the business of designing, commissioning the manufacture of, and selling die-cast and resin scale models, but does not itself manufacture the scale models. *Id.*

8. Glen Chou, the president and a co-owner of Sunrich, is solely responsible within Sunrich for deciding what models to have built. *Id.*

9. Cindy Chou, the vice president and a co-owner of Sunrich, is responsible for handling the financial aspects of Sunrich, *i.e.*, the accounting function, but plays no role in the design and development or sales of Sunrich products. *Id.*

10. Exoto has identified twelve models of race cars that it contends were manufactured by Defendants using Exoto tooling: McLaren models MP4/6 F1, M8B, and M8D; Porsche models 935 and 936; Chaparral models 2D, 2E, and 2F; Aston Martin Vanquish; Lincoln Continental; and Ford models GT40 Mark II and Mark IV. *Id.*

---

[3] Facts 1 through 18 are taken from the Court's findings of fact in its order on the motion for summary judgment. ECF No. 81.

11. The following chart summarizes Sunrich's commission, production, and sale of the respective models:

| Model | Sold by Sunrich |
|---|---|
| McLaren MP4/6 F1 | Yes, in 1:18 scale in molded resin. |
| McLaren M8B | No |
| McLaren M8D | Yes, in 1:18 scale in molded resin. |
| Porsche 935 | Yes, in 1:18 scale die-cast metal like Exoto. |
| Porsche 936 | Yes, in 1:18 scale die-cast metal. |
| Chaparral 2D | Yes, in 1:43 scale in molded resin, not die-cast metal like Exoto. |
| Chaparral 2E | Yes, in 1:43 scale in molded resin, not die-cast metal like Exoto. |
| Chaparral 2F | Yes, in 1:43 scale in molded resin, not die-cast metal like Exoto. |
| Aston Martin Vanquish | No |
| Ford GT 40 Mark II | No, Sunrich only re-sold models purchased from Spark models. |
| Ford GT 40 Mark IV | No, Sunrich only re-sold models purchased from Spark models. |
| Lincoln Continental | No |

12. Sunrich has not commissioned, produced, or sold models of the McLaren M8B, the Aston Martin Vanquish, the Lincoln Continental, the Ford GT40 Mark II, or the Ford GT40 Mark IV. *Id.*

13. It produced a 1:43 scale Ford GT race version of the same, but in molded resin, not die-cast metal, that were sold in sets with the Ford GT Mark II and Mark IV, respectively, which were purchased from MiniMax (aka Spark Models). *Id.*

14. Sunrich commissions but typically does not purchase the tooling that is used to manufacture its model cars. *Id.*

15. Instead, Sunrich typically tells the manufacturer what it wants to have made, provides information to the manufacturer that is needed to produce the product, the manufacturer then produces and packages the product in its factory, ships the packaged products to Sunrich, which sells them. *Id.*

16. Sunrich pays for the tooling used to make the models as part of the development costs charged by the manufacturer but does not own the tooling, which stays with the manufacturer. *Id.*

17. After the production run is completed, the tooling is normally left with the factory. *Id.*

18. The manufacturer then either gives the tooling to Sunrich or sells it for scrap. *Id.*

**B.    Exoto's manufacturing process for a model car.**

19. For Exoto, to make a model car, the first step is to gather pictures, videos, sketches, and other information about the car itself to create an engineering model, otherwise known as a master pattern. T. Keusseyan Tr. 22:6-25:11; Sinisi Tr. 228:23-8; 247:20-248:7.

20. From the master pattern, the tooling is created, which spans a number of blocks that make up a tool set. T. Keusseyan Tr. 35:2-20.

21. Once the tooling is created, a "first shot" model (which is the very first model produced by the tooling itself) and other subsequent "shots" are made through a debugging process, until there is a finalized production model to manufacture. T. Keusseyan Tr. 25:9-11; 27:2-10.

22. Leasear Ltd. ("Leasear") is a Hong-Kong-based company that manufactured tooling for Exoto's models and in particular, the Porsche 936. T. Keusseyan Tr. 35:19-36:8.

23. Exoto used a design firm to do the research and design portion of the process, and the resulting materials were then given to Leasear to produce the tooling; for the Porsche 936 model, Exoto used Sinisi's Design Circle as the design firm. T. Keusseyan Tr. 22:2-23:19; 35:19-36:3.

**C.    Sunrich's manufacturing process for a model car.**

24. Defendants used more of a "one stop shop" for production of their model cars— doing the information gathering themselves but having their supplier handle all the design, development, and production. G. Chou Tr. 378:14-379:8.

25. With regards to the Porsche 936 in particular, Sunrich gathered evidence from a variety of sources, including books, the internet, and photos from events. G. Chou Tr. 152:10-21.

26. Sunrich also received information about the Porsche 936 from the Porsche Museum, where Defendants could take measurements from the actual physical car. G. Chou Tr. 152:22-153:12.

27. Sunrich also received a historical photo of the underside of the Porsche 936 from the Porsche Museum. G. Chou Tr. 387:13-22; 418:17-419:13.

28. As of the time of trial, Defendants did not have the majority of the documentation they stated was sent over to Max Smart to model the Porsche 936—outside of a few photos. G. Chou Tr. 427:5-7.

29. Max Smart went out of business around 2011. G. Chou Tr. 158:5-11.

30. The tooling created by Max Smart for Sunrich for the Porsche 936 comprised 11-12 tooling blocks, from which models comprising 300-400 parts were made. G. Chou Tr. 400:15-20.

**D.    Several Leasear tool sets went missing from the Leasear facility.**

31. In 2015, Leasear held over 30 tool sets for Exoto. Keusseyan Tr. 54:5-7.

32. Sunrich released their Porsche 936 model around 2012, but Exoto did not have a "big red flag" that something was wrong with Exoto's tools at Leasear until 2015 or 2016, and did not have confirmation that Exoto's tools were missing from Leasear until November of 2018. Keusseyan Tr. 98:13-99:10; 126:2-127:15.

33. In or around 2015, Leasear advised Keusseyan to come and get "whatever is left or available" from its site. Keusseyan Tr. 40:19-41:13, 53:2-8.

34. Although Keausseyan did not have the opportunity to get Exoto's tool sets as instructed, he understood that of the over 30 tool sets that Leasear should have had in its possession at the time, only around 20 remained, and a little over 10 were unaccounted for. Keusseyan Tr. 52:18-54:14.

35. Leasear denied Exoto access to its tooling during the period of time that Exoto was trying to confirm the location of its tools. Keusseyan Tr. 99:19-100:5.

36. Mr. Keusseyan could not recall if he ever sent an email or wrote a letter or asked his counsel to contact Leasear to find out what happened to Exoto's missing tooling. Keusseyan Tr. 100:22-101:1.

37. Exoto has no knowledge on where the 10 missing tool sets ended up; it is Keusseyan's belief that they were stolen. Keusseyan Tr. 134:4-11.

38. Among the 10 missing tool sets was the tool set for the Porsche 936. Keusseyan Tr. 55:2-24.

39. There was no admissible evidence that anyone from Defendants had ever bragged about acquiring Exoto's tooling. Keusseyan Tr. 92:13-95:3.

40. Exoto did not know the exact time frame of when its tooling was purportedly stolen from Leasear, and was unable to obtain any knowledge from Leasear about what happened to its tools which were in Leasear's possession. Keusseyan Tr. 88:20-25; 98:13-101:1.

### E. Sunrich commissioned and paid for tooling of a Porsche 936 model.

41. Prior to its plans to make a Porsche 936 model, Sunrich made a Porsche 935 model as its first model car, and paid Carousel 1, a company that made model cars, about $90,000 to $100,000 USD for the Porsche 935 tooling. G. Chou Tr. 143:25-144:18; 146:3-20.

42. Sunrich commissioned Max Smart, a supplier located in China that it previously worked with, for the design and development of its Porsche 936 model. G. Chou Tr. 155:15-22; 157:15-16.

43. Max Smart previously built the Porsche 935 for Sunrich, using the tooling that Sunrich obtained from Carousel 1. G. Chou Tr. 425:4-23.

44. Sunrich produced invoices for the tooling used in the production of the Porsche 936 model, which showed that Max Smart billed Sunrich $107,507 for the mold/tooling for the Porsche 936 model in April 2011, and another $13,196 for a hand sample and 3d file. Exhibit 204; G. Chou Tr. 378:4-13; 380:5-381:8.

45. The invoices were approved by Glen Chou and paid by Cindy Chou. G. Chou Tr. 381:9-22; C. Chou Tr. 446:19-447:4.

46. The particular model Porsche 936 that Defendants first developed was a 936/77, the 1977 LeMans winner, that was sitting in the Porsche Museum. G. Chou Tr. 382:21-25.

47. Max Smart went out of business in 2011, after only producing a small batch of test models. G. Chou Tr. 158:14-25.

48. Sunrich then had the tooling moved to Deles International, which finished the final tooling adjustments and started manufacture of the Porsche 936 model. Deles also went out of business, in approximately 2012. G. Chou Tr. 159:1-12, 174:7-18.

### F. Similarities and differences between Sunrich and Exoto's Porsche 936 models.

49. The Porsche 936 design varies from version to version, and cars that are purchased by the racing teams make their own modifications to the cars such that every race car is different. Sinisi Tr. 310:18-311:4.

50. There were similarities in Sunrich's claimed master pattern and Exoto's third shot, but there were also a number of differences. Sinisi Tr. 384:13-25; 288:15-22; Glucksman Tr. 472:3-477:15; Exhibits 241-244.

51. Exoto's third shot and Sunrich's production model were 30–60% different. Sinisi Tr. 348:13-20.

52. Some of the differences identified likely would have required either different tooling, or modification of the tooling. Glucksman Tr. 485:21-486:25.

53. Making alterations to the tooling would be costly. Glucksman Tr. 491:7-16.

54. The Exoto first shot is made of approximately 400 to 600 parts, whereas the Sunrich production model is closer to 300 to 325 parts, which would require different tooling. Sinisi Tr. 325:11-326:20.

55. To start from 20-25 tooling blocks meant to create 600 pieces and go down to 10-12 blocks to create a model with 300 pieces would require consolidating numerous trees (runners) from different blocks of tool into one, which would be extremely expensive. Glucksman Tr. 525:1-20.

### G. Evidence of Sunrich's production of the other identified models besides the Porsche 936.

56. Other than the Porsche 936, the McLarenMP4/6, and the Chaparrals, Defendants did not commission tooling to produce any of the other models identified by Exoto. G. Chou Tr. 197:24-198:13.

57. The McLaren MP4/6 model was built in 1:18 and 1:43 scale molded resin, not die-cast, by Xianling in China. G. Chou Tr. 181:14-21; 183:14-21; 186:12-13; T. Keusseyan Tr. 55:19.

58. The Chaparrals were made in 1:43 scale molded resin by Spark Model, not die-cast. For the 1:43 scale models, far less information was needed to building tooling, and no information was needed for the internal components. G. Chou Tr. 182:22-183:13; 183:22-184:7.

### H. Sunrich and Leasear

59. Mr. Chou was not previously aware of Exoto's business relationship with Leasear, and Sunrich did not do business with Leasear. G. Chou Tr. 160:22-162:16; 188:5-9.

60. None of Defendants' vendors informed Mr. Chou that they had acquired any tooling from Leasear. G. Chou Tr. 408:11-15.

61. At one point in time prior to this litigation, Mr. Keusseyan emailed Mr. Chou asking whether Sunrich had Exoto's tools, to which Mr. Chou replied that they did not. G. Chou Tr. 187:6-11.

### I. Evidence of damages.

62. Exoto spends on average for a project $300,000, between costs to the companies it works with in the United States and the companies it works with in China to develop the tooling, and estimated that it spent $300,000 to develop the tooling for the Porsche 936. Keusseyan Tr. 33:12-20; 34:13-17.

63. Exoto paid Leasear at least $73,600 for its work on the Porsche 936 tooling. Keusseyan Tr. 132:15-133:25; Ex. 39-074.

64. Exoto estimated that on average its models sold for $500 each, and planned to sell its Porsche 936 for $500 each. Keusseyan Tr. 67:3-4.

65. Exoto has no documentary evidence to support how many models of a Porsche 936 model would have sold. Keusseyan Tr. 68:1-4.

66. Exoto keeps records that reflect the sales of its past cars. Keusseyan Tr. 107:6-114:2.

/ / /

/ / /

### III. CONCLUSIONS OF LAW

#### A. Jurisdiction and Venue

1. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1138(a).

2. This Court has supplemental jurisdiction over Exoto's state law claims under 28 U.S.C. § 1367(a).

3. This Court has personal jurisdiction over the parties because the parties conduct business within this forum, and the claims at issue are alleged to have occurred in California.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

#### B. Plaintiff failed to prove conversion (Claim 1)

5. To prevail on its claim for conversion, Exoto must show by a preponderance of the evidence (1) its ownership of or right to possess the tooling at the time of the conversion, (2) that Defendants disposed of Exoto's property rights or converted the tooling by a wrongful act, and (3) damages. *Messerall v. Fulwider*, 199 Cal. App. 3d 1324, 1329 (1988); *see also Tyrone Pac. Intern., Inc. v. MV Eurychili*, 658 F.2d 664, 666 (9th Cir. 1981).

6. With respect to ownership or right to possess, "merely alleging ownership [of the allegedly converted property] is insufficient to establish conversion." *Finton Construction, Inc. v. Bidna & Keys, APLC*, 238 Cal. App. 4th 200, 213 (2015).

7. Exoto proved by a preponderance of the evidence that it had commissioned Leasear to produce tooling for the manufacture of a Porsche 936 at some point in time.

8. There was no evidence indicating what happened to the tooling after Exoto's possession of it through its consignment with Leasear.

9. Exoto did not prove by a preponderance of the evidence that the Porsche 936 model, or any other model, sold by Sunrich was manufactured using Exoto tooling or tooling derived from Exoto's tooling.

10. In particular, the Court finds insufficient evidence presented at trial on the conversion of any model other than the Porsche 936.

11. As Exoto also did not contend that it had shown conversion of these models in its

post-trial briefing, it appears that Exoto has abandoned its claims as to the non-Porsche models.

12. Exoto has not shown that the tooling used by Defendants in the production of the Porsche 936 was wrongfully obtained from Leasear.

13. There is no evidence of how Sunrich would have acquired the tooling from Leasear itself, as Sunrich did not operate in China, nor is there any evidence that Sunrich directed its supplier or any third party to acquire the tooling from Leasear.

14. Defendants' supplied documentation is missing the level of reference material needed to make the model of the Porsche 936 it sold, including notably the lack of actual documentation showing the underside of the car.

15. However, given that it appears that Defendants had no need of this documentation for years prior to this litigation, it appears reasonable that Defendants no longer possessed all the documentation originally used.

16. With regards to the underside of the car, Glen Chou testified that he obtained a photograph of the underside of the car from the Porsche Museum.

17. The Court finds that based on the similarities and differences identified, Exoto did not prove by a preponderance of the evidence that the Sunrich Porsche 936 model was more likely than not manufactured using Exoto's tooling or derived from Exoto's tooling for the Porsche 936 model.

18. While Exoto pointed out similarities in the models, Exoto also does not contest that there are differences in the models.

19. Although Sinisi *testified* that there were certain "design" choices in Exoto's model that would not have existed on the real car, Exoto pointed to no other *evidence* of this. And Mr. Chou stated that he was not aware until trial that Exoto claimed their models included design choices that did not exist on the actual car. Chou Tr. 413:21-25. Mr. Glucksman also testified that the similarities between Exoto and Sunrich's models would be expected from two of the same vehicles. Glucksman Tr. 472:3-10. Therefore, although there was a dispute about whether the design choices pointed out were actually unique and signatures of Exoto (as opposed to reflections of the original vehicle), and despite the fact that Exoto apparently had considerable evidence on its intensive process in gathering photos and data on the real car in the making of its tooling, it did not show that these features

described as "design choices" did *not* actually exist on the real car.

20. Rather, Mr. Glucksman pointed out significant differences in the two models in his testimony, which the Court found persuasive. Exhibits 241-244; Glucksman Tr. 472:6-491:16. The number of differences means that there are only two options: either Sunrich's model was made from Exoto's tooling with substantial alterations or Sunrich's model was not made from Exoto's tooling at all. The Court finds that the evidence is persuasive that substantial alterations of the sort needed for the first option to be true would be extremely complex and costly, and there is no evidence that explains why—if Sunrich was using Exoto's tooling—it would make these substantial alterations, given how complex and costly they would be.

21. In sum, Exoto has failed to show that it is more likely than not that Sunrich substantially altered Exoto's tooling in order to make its model.

22. Even if this Court was inclined to believe that either no substantial alteration was needed or that Sunrich for some reason engaged in this substantial alteration, Exoto has not shown the wrongful *acquisition* of its tooling by Sunrich.

23. Defendants commissioned and paid for its tooling of the Porsche 936 from Max Smart.

24. Even assuming Defendants' suppliers somehow ended up with Exoto's tooling for the Porsche 936, there is no evidence that the toolset's eventual acquisition *by Defendants* was wrongful, because there is no evidence of what happened to the tooling after Leasear's possession of it.

25. Exoto has not shown that Defendants were put on notice of any wrongful acquisition of its tooling, as the only evidence in the record is Mr. Keusseyan's testimony about an email he sent to Mr. Chou.

26. However, there was no testimony provided about the time frame this email was sent or its specific contents, and the email itself was not introduced into evidence.

27. Regardless, Exoto's inquiry of whether Defendants had Exoto's tooling would not have necessarily put Defendants on notice.

28. In particular, it is unclear how Defendants would have been able to confirm whether their tooling was Exoto's given that (1) Exoto never produced a model to the public that Defendants

could have actually compared their model with, and (2) Max Smart, the supplier that actually made the tooling, was out of business already.

29. Because Plaintiff has failed to prove the first two elements of conversion, it is unnecessary for the Court to reach a conclusion with respect to the damages element.

30. However, even if the Court were to find that Sunrich unlawfully acquired Exoto's tooling, the evidence of damages in the record is largely speculative.

31. "As a general rule, damages which result from a tort must be established with reasonable certainty. . . . [A] reasonable basis for computation must exist." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407–08 (9th Cir. 1993), cert. denied, 114 S.Ct 64 (1993).

32. The two possible measures of damages presented were (1) the amount it cost Exoto to produced the tooling for the Porsche 936 model, and (2) the purported lost profits from not being able to produce the model.

33. With respect to the costs of producing the tooling, Exoto has only presented Mr. Keusseyan's testimony that on "average," the cost of the design to production phase of a model is about $300,000.

34. However, with regards to the Porsche 936 tooling, no evidence was presented about the actual cost of developing this tooling beyond one invoice amounting to $73,600 regarding Exoto's payment to Leasear.

35. With respect to the lost profits, Exoto has failed to present evidence that would allow the Court to calculate with reasonable certainty the damages under any claim it has asserted, and rests the majority of the evidence of damages on Mr. Keusseyan's testimony.

36. Exoto did not present a detailed computation of its lost profits on a model-by-model basis supported by admissible evidence, instead basing its damages on conjecture and speculation without underlying support, notwithstanding that Mr. Keusseyan testified that such supporting documents exist at Exoto.

37. The Court finds this insufficient for establishing future lost profits. *See, e.g., Greenwich S.F., LLC v. Wong*, 190 Cal. App. 4th 739, 766 (2010) (finding lost profits not established with reasonable certainty where the assumptions they were based on "were inherently uncertain,

contingent, unforeseeable and speculative").

38. In particular, even assuming that Exoto would have sold the model for $500 per car, Mr. Keusseyan testified that it would have produced between a range of 15,000 to 30,000 models, "depending on the economy [and] the market situation." Keusseyan Tr. 67:7-14. Not only was there no other evidence of what Exoto's cars sold for on average, there was no other evidence of how many models Exoto sold for any of its cars over a period of time.

39. Then, when asked how much money Exoto would have lost over the Porsche 936, Mr. Keusseyan states "I would say a million dollar at least." *Id.* at 67: 18-25. It is unclear how Mr. Keusseyan arrived at this number based on the numbers he gave regarding the average price of models and the amount of models Exoto sold on average. Accordingly, the Court does not find that Exoto established its future lost profits with any reasonable certainty.

40. Therefore, the Court finds that Exoto has failed to establish damages beyond at most $73,600 in costs even if it met the other elements of its claim.

### C. **Plaintiff failed to prove unjust enrichment (Claim 2)**.

41. "Unjust enrichment is not a cause of action, however, or even a remedy, but rather 'a general principle, underlying various legal doctrines and remedies. . . It is synonymous with restitution.'" *Melchior v. New Line Productions, Inc.*, 106 Cal. App. 4th 779, 793 (2003).

42. To prove unjust enrichment, Exoto must prove by a preponderance of the evidence that Defendants received and unjustly retained some benefit at its expense. *Prof'l Tax Appeal v. Kennedy-Wilson Holdings, Inc.*, 29 Cal. App. 5th 230, 238 (2018) (quoting *Lectrodryer v. Seoulbank*, 77 Cal. App. 4th 723, 726 (2000).

43. Exoto bases its unjust enrichment claim on the same facts that it alleges in support of each of its other claims, as set forth in paragraphs 50-54 of its Complaint. As the Court has found Exoto has failed to prove its claim for conversion (Claim 1) and Claims 3-8 and 10-13 by a preponderance of the evidence, Exoto has failed to prove Defendants were unjustly enriched by their actions.

/ / /

/ / /

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Exoto's First Claim for Conversion and Second Claim for Unjust Enrichment fail, and judgment is entered in favor of Defendants.

IT IS SO ORDERED.

Dated: January 14, 2025

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge